Haldane M. Plunkett v. Commissioner.
Plunkett v. Commissioner
Docket Nos. 4762-68, 4764-68.
United States Tax Court
T.C. Memo 1970-274; 1970 Tax Ct. Memo LEXIS 83; 29 T.C.M. (CCH) 1237; T.C.M. (RIA) 70274; September 29, 1970. Filed *83 Held: (1) A part of the underpayment of tax for each of the years 1957 through 1959 was due to fraud within the meaning of sec. 6653(b), I.R.C. 1954, and additions to tax under that section are sustained. Held: (2) The return for 1957 was false or fraudulent with intent to evade tax. Consequently, the statute of limitations did not bar the assessment of a deficiency for 1957. Section 6501(c)(1), I.R.C. 1954. Held: (3) Petitioner's conviction, pursuant to a plea of guilty, under sec. 7201, I.R.C. 1954, for tax evasion in the years 1960, 1961, 1962 and 1963 collaterally estops him from denying that a part of the underpayments for those years was due to fraud. Arthur N. Nasser, 10 S. LaSalle, Chicago, Ill., for the petitioner. Nelson E. Shafer, for the respondent. QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: Docket No. 4762-68 involves the taxable years 1957 through 1959, and docket No. 4764-68 involves the taxable years 1960 through 1963. Thses are cases for the redetermination of deficiencies in income tax, additions to the tax, and alleged overpayments as follows: Year
Income Tax
Dkt. No. 4762-68Additions to the TaxSec. 6653(b) 1954 Code
Over- payment
Dkt. No. 4764-68Additions to the TaxSec. 6653(b) 1954 Code
1957
$9,504.96
$4,752.48
1958
$6,558.90
$2,589.88
1959
$6,477.07
$5,681.41
1960
$4,490.20
1961
$5,183.23
1962
$1,455.10
1963
The issues presented for decision are:
(1) Whether any part of the admitted underpayments of tax for the taxable years 1957, 1958 and 1959 was due to fraud so as to render petitioner liable for the additions to tax for fraud under section 6653(b) [1] for those years. *84 (2) Whether the statute of limitations established by section 6501(a) bars the assessment or collection of tax for the taxable year 1957. (3) Whether the petitioner is collaterally estopped to deny fraud for the taxable years 1960, 1961, 1962 and 1963 because of his conviction based on his plea of guilty to a charge of willful attempt to evade income tax under section 7201 for said years. Findings of Fact The evidence submitted consists of a stipulation of facts with exhibits attached, a supplemental and oral stipulation of facts, oral testimony and exhibits received at trial. The facts as stipulated are incorporated herein by this reference. Respondent relies entirely on the doctrine of collateral estoppel, based on Haldane M. Plunkett's criminal conviction under section 7201, to sustain the fraud penalties asserted against Haldane M. Plunkett for the years 1960 through 1963. Consequently, the evidence pertaining to the fraud penalties for 1238 those years is limited to the original and amended joint returns filed by or on behalf of Haldane and Dorothy Plunkett for the years *85 1960 through 1963, and to matters involving the aforementioned criminal prosecution. As to the years 1957 through 1959, there are no such limitations and all appropriate available evidence for those years will be considered. Haldane M. Plunkett, petitioner in docket Nos. 4762-68 and 4764-68, is an individual who, at the time the petitions herein were filed and at all other times pertinent hereto, resided in Chicago, Illinois. Petitioner and Dorothy Plunkett, the petitioner in docket No. 4763-68, a case which is related to docket No. 4764-68, are and have been husband and wife since they remarried in 1960. The statutory notice of deficiency involved in docket No. 4762-68 was mailed to petitioner on July 11, 1968. The statutory notice of deficiency, which is common to and involved in docket Nos. 4763-68 and 4764-68, was mailed to petitioner and Dorothy Plunkett (hereinafter referred to as "Mrs. Plunkett") on the same date. For each of the years 1957, 1958 and 1959 original individual Federal income tax returns were executed by Haldane M. Plunkett (hereinafter referred to as "petitioner") and timely filed by or on behalf of the petitioner with the district director of internal revenue, *86 Chicago, Illinois. For each of the years 1960, 1961, 1962 and 1963 original joint individual Federal income tax returns were executed by petitioner and Mrs. Plunkett and timely filed by or on behalf of said individuals with the district director of internal revenue, Chicago, Illinois. Petitioner's original returns for the years 1957, 1958 and 1959 were prepared by others based on information furnished by him. Starting in or about 1922, petitioner worked with his parents in the operation of a business whereby different food products were advertised by serving them to various clubs and organizations. By the early 1950's, that business was being phased out and replaced by a catering business, which petitioner has operated since the death of his mother in 1955. During the years 1957 through 1963, petitioner engaged in the business of food catering with the assistance of Mrs. Plunkett. According to petitioner's individual and joint income tax returns, this business was conducted under the name of Plunkett's Catering and Dinners during the years 1957 through 1960, and under the name of Plunkett Famous Dinners during the years 1961 through 1963. Petitioner devoted the greater portion *87 of his working hours exclusively to his catering business. His formal education did not extend beyond grammar school as he had gone to work in the family business before he was 12 years old. Petitioner did not maintain formal books of account and records in the conduct of his business and did not retain a bookkeeper or an accountant to maintain such books of account and records. Income from petitioner's catering business was normally deposited in a bank account. During the year 1957, receipts from the catering business were generally deposited to an account captioned "Plunketts Mfr. Dinners" at Aetna State Bank, Chicago, Illinois. The total amount of deposits to this account in 1957 was $155,396.37. A customer order record book was maintained in the conduct of petitioner's catering business during the years 1957, 1958 and 1959. The record book had provision or space available to record the amount that was charged for each catering event, but the amount was not always recorded. In the conduct of his catering business, petitioner received invoices or bills for goods and materials that were bought and used. Such bills were generally paid by check. Unpaid bills were kept and retained *88 in one drawer and paid bills were kept in a second drawer. In computing the net business income figures shown in his original 1957, 1958 and 1959 returns, petitioner testified that he estimated his total expenses and deducted that amount from his estimated gross receipts or that he deducted the total estimated expenses from the amount that was deposited in his bank account. Petitioner has engaged in security transactions in the stock market since the 1930's or 1940's, and has participated in the commodity futures market since 1955 or 1956. During the years 1957 through 1959, petitioner subscribed to a security advisory service and received other security information. During the years 1957 through 1959, petitioner had a margin account at Betts, 1239 Borland & Co., stockbrokers, Chicago, Illinois. Cash dividends were periodically credited to petitioner's margin account, and he was furnished with a notice or slip advising him of each such dividend credit. In addition, he received a monthly statement of his account (for any month in which there was a transaction) showing the dividends credited to him and other entries concerning his account. Credits for each dividend received were represented *89 by "Div" entries in the margin account. In maintaining his margin account, petitioner borrowed money from Betts, Borland & Co. (hereinafter referred to as the "Company"). Dividends credited to the margin account were sometimes (primarily in 1957) transferred to a special account which was maintained for internal bookkeeping pur9oses by the Company, or were retained by the Company to reduce the balance due and outstanding in the margin account. The special account was an unrestricted account; i. e., there were no restrictions on the withdrawal of funds in the special account. Transfers from the special account to the margin account would be made to satisfy a margin call. During the years 1957, 1958 and 1959, it was the Company's practice to furnish customers with a statement of their special account for any month in which there was a transaction. Dividends were credited to petitioner's margin account (these credits were represented in the margin account by entries marked "Div" in the numbers indicated below) during 1957, 1958 and 1959 in the following aggregate amounts: Year
Amount of Dividends
Number of Dividend Entries in Margin Account
1957
* *90 $12,821.35
Approximately 100 divi- dend
1957
* $12,821.35
Approximately 100 divi-dend entries in each of the years 1957, 1958 & 1959
1958
$11,834.00
1959
$12,548.25
Petitioner failed to report any dividend income for the taxable years 1957, 1958 and 1959. During these years, petitioner knew that dividends were taxable income. Nevertheless, petitioner testified that he thought he had to report dividends credited to his account as income only when and if he withdrew them from his account. He testified that he did not withdraw his dividends during the years 1957, 1958 and 1959 because he thought that he might sometime need the funds for tax purposes. Petitioner testified that in or about December 1963, he became concerned with the manner in which he was handling the reporting of his tax affairs. In March or April 1964, and on some infrequent occasions thereafter, petitioner had informal discussions concerning his tax returns with Alderman Tom Rosenberg (hereinafter referred to as "Rosenberg"), but no particular taxable year or years were discussed. Petitioner testified that at the time he consulted with Rosenberg he did not know whether or not he owed the government any additional taxes. He also stated that Rosenberg *91 advised him that he, Rosenberg, was not capable of handling the matter but that he would assist the petitioner in locating someone to help him with his problem. Petitioner testified that in May of 1964, Rosenberg advised him that he knew of someone who could handle the petitioner's income tax problems and that he would get the man for petitioner as soon as possible. Petitioner testified that he met with Rosenberg and the man Rosenberg had located, attorney Arthur N. Nasser (hereinafter referred to as "Nasser"), between June 12 and June 20, 1964 in relation to petitioner's income tax matters. On June 22, 1964 revenue officer Arthur Mourad (hereinafter referred to as "Mourad") conferred with petitioner, Mrs. Plunkett and a Willard Sellers, an employee of petitioner. The initial and principal purpose of this visit to petitioner's place of business was to contact Willard Sellers to verify the filing by Sellers of his income tax returns for 1961 through 1963. Mourad had not been assigned the income tax returns of petitioner for examination. On June 24, 1964 petitioner, Rosenberg and Nasser again met to discuss petitioner's income tax affairs. At this time, Nasser was retained as attorney *92 by petitioner. Shortly thereafter, on June 26, 1964, Mrs. Plunkett drew a check on the checking was predicated strictly and entirely account of Plunkett Famous Dinners in the amount of $500 payable to Arthur N. Nasser for services to be rendered. Said check was mailed to Nasser by petitioner by letter dated June 27, 1964. By letter dated June 26, 1964, Nasser requested Sidney Tresley (hereinafter referred to as "Tresley"), a certified public accountant, to assist him in representing, 1240 inter alia, petitioner. Tresley accepted the offer and commenced his work shortly thereafter. Tresley assisted Nasser in the preparation of amended returns for the years 1958 through 1963, and the work was completed in approximately 6 or 7 weeks, and the fully prepared amended returns were presented to Nasser for examination on or about July 31, 1964. These returns were prepared from petitioner's records of receipts and disbursements, bank statements, canceled checks and stock brokerage accounts. Business receipts reflected in the amended returns were derived from a daily record of receipts and from bank deposits. Business expenses reflected in the returns were determined from an analysis of checks *93 issued. Business receipts and expenses for 1957 were determined in a similar manner and then recorded on a summary schedule or work sheet prepared by Tresley. Dividend income reflected in the amended returns was determined from the broker's monthly reports or statements. The books and records which petitioner made available to Nasser and Tresley for the preparation of the amended returns were available to the petitioner when he filed his original returns. Incident to the preparation of the amended returns, Tresley utilized the information given to him to reconstruct a pro forma set of books and records for petitioner's catering business for the years 1957 through 1963. On July 1, 1964 Mourad again conferred with the petitioner. On July 7, 1964 Mrs. Plunkett drew a check on the checking account of Plunkett Famous Dinners in the amount of $1,250.50 payable to Tresley. This sum represented a retainer for the preparation of amended returns for the taxable years 1958 through 1963. On July 29, 1964 revenue agent Melvyn Gordon (hereinafter referred to as "Gordon") spoke with Mrs. Plunkett by telephone relative to arranging an appointment to conduct an examination of petitioner's and Mrs. *94 Plunkett's 1962 joint income tax return and related employment tax returns. In connection with his assignment, Gordon had been assigned to look into compliance with the requirements of Forms 940 [2] and 941. [3] His basic interest at that time was the employment tax returns, as the 1962 joint income tax return of petitioner and Mrs. Plunkett had not been assigned to him for audit. Mrs. Plunkett, in accordance with Nasser's advice, referred Gordon to Nasser. Gordon conferred with Nasser by telephone on July 29, 1964 and again on August 3, 1964. For each of the years 1958 and 1959, amended Federal income tax returns were executed by petitioner and filed by or on behalf of the petitioner with the district director of internal revenue, Chicago, Illinois on August 6, 1964. Based on the advice and judgment of counsel (Nasser) and the objective of forestalling criminal prosecution for years which were not barred by the statute of limitations, no amended income tax return for 1957 was prepared and filed on behalf of the petitioner. For each of the years 1960, 1961, 1962 and 1963, amended *95 joint individual income tax returns were executed by petitioner and Mrs. Plunkett and filed by or on behalf of these individuals with the district director of internal revenue, Chicago, Illinois on August 6, 1964. Respondent has accepted the information contained in the amended returns as accurately reflecting the income, expenses and deductions of petitioner for 1958 and 1959, and petitioner and Mrs. Plunkett for 1960 through 1963, except as indicated by the statutory notice of deficiency underlying this case. On August 6, 1964 petitioner arranged for a loan of $80,000 from the Company. On the same day, the additional taxes shown on the aforementioned amended returns plus statutory interest thereon were paid to the internal revenue service. On August 11, 1964 Gordon visited Nasser in the latter's office. At this meeting, Nasser advised Gordon that amended returns had been filed and deficiencies paid regarding the income tax returns of previous years. He also stated that he, Nasser, would not cooperate in any investigation (although no criminal tax investigation of petitioner was pending at this time) because the amended returns "spoke for themselves." 1241 Subsequent to August 11, *96 1964 a criminal investigation of petitioner's 1958 and 1959 original and amended income tax returns was conducted by special agent James Coleman (hereinafter referred to as "Coleman"), who was assisted first by Gordon and later by revenue agent Ronald Frisch (hereinafter referred to as "Frisch"). Coleman conferred with petitioner, Nasser or Tresley on several occasions between November 1964 and May 1965. Except for identifying who prepared petitioner's amended return, neither petitioner nor his representatives cooperated with Coleman in his investigation of petitioner's returns. In particular, they declined to furnish books and records, information relative to the amended returns, the nature of petitioner's business, and the identity of his customers. As in all other instances in this case, this lack of cooperation was predicated strictly and entirely on the advice of counsel (Nasser). On December 20, 1966 a four-count indictment was returned against petitioner and Mrs. Plunkett in the United States District Court, Northern District of Illinois, Eastern Division, Criminal No. 66 CR 769, for violating section 7201, Internal Revenue Code of 1954, with respect to their original income *97 tax returns filed for each of the years 1960 through 1963. On January 5, 1967 petitioner and Mrs. Plunkett entered pleas of not guilty to the charges set forth in the aforementioned indictment. On September 20, 1967 petitioner, by his attorney Maurice J. Walsh, tendered pleas of nolo contendere to the charges set forth in the indictment in the aforementioned criminal proceeding, in lieu of the not guilty pleas theretofore entered, with counsel's stated understanding that the government would then move to dismiss the indictment as to Mrs. Plunkett. Counsel for the government in Criminal No. 66 CR 769 objected to the tendered pleas of nolo contendere by petitioner and stated that the government would not move to dismiss Mrs. Plunkett if the pleas of nolo contendere and a judgment of guilty were entered. Petitioner, through his attorney, thereupon withdrew his tender of the nolo contendere pleas and entered pleas of guilty in lieu of his earlier pleas of not guilty. Following a colloquy between petitioner and Judge Alexander J. Napoli, who presided at the proceedings in Criminal No. 66 CR 769 on September 20, 1967, Judge Napoli entered petitioner's pleas of guilty to the aforementioned *98 indictment. The government then moved to dismiss Mrs. Plunkett from each of the four counts of the indictment, and the motion was granted. During the colloquy, petitioner acknowledged that he was fully aware of what the charge was that was pending against him. He also acknowledged that he understood that by entering a plea of guilty to the charges against him, he was waiving his right to a trial by jury. He also understood that, as a consequence of his guilty pleas, he could be sentenced to a maximum of 5 years in prison and fined up to $10,000 on each of the counts in the indictment against him. Petitioner also stated during the colloquy that as to himself no representations of any kind had been made to him as to what the disposition of his case would be in view of his guilty pleas. As to himself, he made the guilty pleas without any reservations of any kind and without any promises of any kind having been made to him. Sentence was entered against petitioner in Criminal No. 66 CR 769 on October 31, 1967. He was sentenced to 3 years probation on each count of the indictment, to run concurrently on condition that he serve 90 days of the probation in a "jail type" institution commencing *99 November 13, 1967. He was fined $10,000 on each of counts one and two of the indictment (1960 and 1961). At the trial of the case now before us, petitioner testified that he entered pleas of guilty to the four counts of the indictment because he understood that if he would plead guilty, the indictment against his wife, Mrs. Plunkett, would be dismissed. Petitioner testified that he did not believe he was guilty of tax evasion at the time he had pleaded guilty to the charges in the indictment. He also testified that he had always intended to pay his proper taxes. On or about November 3, 1967 petitioner suffered a stroke. On or about January 24, 1968 petitioner paid the $20,000 fine in Criminal No. 66 CR 769 by cashier's check No. 465911 of the Belmont National Bank of Chicago. On or about January 25, 1968 Judge Napoli vacated that portion of the sentence against petitioner that imposed 90 days' imprisonment. No appeal has been taken from the conviction or sentence in the criminal case against petitioner. The summary sheet prepared by Tresley with respect to petitioner's catering 1242 business sales and expenses for the year 1957 was furnished to Frisch by petitioner's counsel following *100 the conclusion of the aforementioned criminal case. Except for items labeled "charity" and "rent," the respondent has accepted the information contained in the summary sheet as substantially and accurately reflecting petitioner's catering business income and receipts for the year 1957. [4] Following is a summary of petitioner's business income and expenses for the years 1957 through 1963 as reported in *101 his original tax returns for those years, as recorded in Tresley's work sheet or schedule for 1957, and as reported in petitioner's amended returns for 1958 through 1963: Haldane M. Plunkett - Summary of Business Income and Expenses *10 1957
(a)
(b)
(c)
(d)
Per Orig.Return
Per Jt. Exh.20-T
Amount ofUnderstatement
(c) (b)
Gross Receipts
$48,101.58
a $150,076.52
$101,974.94
67.9%
Cost of goods sold 22,219.67
105,408.83
83,189.16
Gross Profit
$25,881.91
$ 44,667.69
$ 18,785.78
Total Other Business Expenses 19,164.99
b 25,778.46
6,613.47
b 25,778.46
6,613.47
Net Profit $ 6,716.92
$ 18,889.23
$ 12,172.31 50.7% *10 1958
(a)
(b)
(c)
(d)
Per Orig.Return
Per AmendedReturn
Amount ofUnderstatement
(c) (b)
Gross Receipts
$56,904.14
$185,932.32
$129,028.18
69.4%
Cost of goods sold 22,627.04
127,827.78
105,200.74
Gross Profit
$34,277.10
$ 58,104.54
$ 23,827.44
Total Other Business Expenses 19,465.48
28,046.12
8,580.64
Net Profit $14,811.62
$ 30,058.42
$ 15,246.80 50.7 1243 1959
(a)
(b)
(c)
(d)
Per Orig. Return
Per Amended Return
Amount ofUnderstatement
(c)(b)
Gross Receipts
$49,318.44
$180,259.86
$130,941.42
72.6%
Cost of goods sold 29,208.32
143,941.00
114,732.68
Gross Profit
$20,110.12
$ 36,318.86
$ 16,208.74
Total Other Business Expenses 13,820.46
21,798.55
7,978.09
Net Profit $ 6,289.66
$ 14,520.31
$ 8,230.65 56.7%
1960
Gross Receipts
$57,826.35
$192,705.92
$134,879.57
69.9%
Cost of goods sold 34,148.98
141,856.36
107,707.38
Gross Profit
$23,677.37
$ 50,849.56
$ 27,172.19
Total Other Business Expenses 14,825.64
22,804.46
7,978.82
Net Profit $ 8,851.73
$ 28,045.10
$ 19,193.37 68.4%
1961
Gross Receipts
$62,359.83
$181,088.81
$118,728.98
65.7%
Cost of goods sold 37,040.95
130,454.92
93,413.97
Gross Profit
$25,318.88
$ 50,633.89
$ 25,315.01
Total Other Business Expenses 16,305.43
25,334.44
9,029.01
Net Profit $ 9,013.45
$ 25,299.45
$ 16,286.00 64.3%
1962
Gross Receipts
$67,538.41
$175,789.06
$108,250.65
61.3%
Cost of goods sold 40,913.76
136,250.89
95,337.13
Gross Profit
$26,624.65
$ 39,538.17
$ 12,913.52
Total Other Business Expenses 17,352.82
25,238.02
7,885.20
Net Profit $ 9,271.83
$ 14,300.15
$ 5,028.32
1963
Gross Receipts
$64,319.56
$231,424.92
$167,105.36
72.2%
Cost of goods sold 40,851.75
162,305.91
121,454.16
Gross Profit
$23,467.81
$ 69,119.01
$ 45,651.20
Total Other Business Expenses 16,950.39
32,762.08
15,811.69
Net Profit $ 6,517.42
$ 36,356.93
$ 29,839.51 82.1%
*102 1244 Petitioner's original and amended returns (or statutory notice) for each of the years 1957 through 1963 reported taxable income and net tax due (including self-employment tax), as follows: *10
Original Returns
Amended Returns
Year
Taxable Income
Income Tax
Taxable Income
Income Tax
1957
$ 5,445.23
$1,357.51
$26,792.88
[5] $10,862.47
1958
12,611.62
3,804.75
40,147.89
19,512.43
1959
4,460.69
1,139.78
43,685.38
19,775.34
196 0
6,166.56
1,492.64
32,695.45
10,473.05
1961
6,312.10
1,524.66
35,460.82
12,346.41
1962
6,544.65
1,585.42
18,679.54
5,056.64
1963
8,245.60
1,673.24
39,965.96
14,121.48
In the statutory notice of deficiency involved in docket No. 4762-68, respondent determined that, for the year 1957, petitioner had a loss from the sale of capital assets in the amount of $14,991.56, of which $13,991.56 was available as a capital loss carryover to the extent indicated in the statutory notice. This capital loss carryover from 1957 was not reflected in the original or amended returns filed by or on behalf of petitioner and/or Mrs. Plunkett. Allowance of the carryover, along with respondent's other statutory notice determinations, would result in overassessments of income tax in the *103 amounts of $2,589.88 and $5,681.41 for the years 1958 and 1959, respectively. Petitioner's original returns for the taxable years 1958 and 1959 were filed on or before April 15, 1959 and April 15, 1960, respectively. On or about the dates indicated, the following amounts were paid by or on behalf of petitioner with respect to the liability in income tax reflected in his original and amended income tax returns for the taxable years 1958 and 1959: Date
Description
Amount
Re: Taxable Year 1958
May 2, 1958
Estimated tax
$ 337.50
May 2, 1958
Estimated tax credit
48.29
June 25, 1958
Estimated tax
313.36
October 1, 1958
Estimated Tax
349.56
January 23, 1959
Estimated tax
349.58
April 15, 1959 (statutory date)
Paid with original 1958 return
2,406.46
August 6, 1964
Paid with amended 1958 return
15,707.68
Re: Taxable Year 1959
May 5, 1959
Estimated tax
350.00
June 19, 1959
Estimated tax
350.00
September 22, 1959
Estimated tax
350.00
January 22, 1960
Estimated tax
350.00
April 15, 1960 (statutory date)
Paid with original 1959 return
89.78
August 6, 1964
Paid with amended 1959 return
18,285.56 No agreements under the provisions of section 6501(c)(4), extending the period for assessment of income tax for the taxable years 1958 and 1959, *104 have been entered into by petitioner and respondent. No claims for refund of income taxes for the taxable years 1958 and 1959 have been filed by petitioner. Opinion Issue 1. Fraud The question is whether or not a part of the underpayment of tax due from the petitioner for each of the years 1957 through 1959 was due to fraud with intent to evade tax within the meaning of section 6653(b). [6] 1245 Whether an underpayment of income is due to fraud is a question of fact. The burden of proof with respect to fraud is placed upon the respondent. Fraud is never presumed but must be shown by clear and convincing evidence for each taxable year involved. Archer v. Commissioner, 227 F. 2d 270 (C.A. 5, 1955); and Bryan v. Commissioner, 209 F. 2d 822 (C.A. 5, 1954), both affirming a Memorandum Opinion of this Court. In sustaining the *105 burden of proof, respondent is not required to prove the precise amount of the underpayment resulting from fraud, but only that "any part" of the underpayment is attributable thereto. Estate of W.Y. Brame, 25 T.C. 824 (1956), affirmed per curiam 256 F. 2d 343 (C.A. 5, 1958). In the determination of the issue of fraud, we are not limited to a consideration of respondent's affirmative evidence. Rather, we may consider the entire record properly before us. Frank Imburgia, 22 T.C. 1002 (1954); and Wallace H. Petit, 10 T.C. 1253 (1948). Fraud may be established by circumstantial evidence. Fraudulent intent is rarely established by a single act or by direct proof of the taxpayer's intention. It is usually found by considering his entire course of conduct, and is to be determined as any other fact from all the evidence and reasonable inferences properly to be drawn therefrom. M. Rea Gano, 19 B.T.A. 518 (1930). Upon consideration of the record as a whole, we are convinced that during each of the years 1957 through 1959, petitioner knowingly received substantial taxable income from his catering business in excess of that reported on his income tax returns for those years, and that in each *106 of such years a part of each underpayment here involved was due to fraud with intent to evade taxes on his part. In determining whether a taxpayer had the necessary intent to evade tax and to defraud the government, the trier of fact must consider his background, environment and experience in business affairs. E.S. Iley, 19 T.C. 631 (1952). Petitioner is pictured as unlearned, untutored and as having a limited formal education. However, he is a person of at least average intelligence and average business understanding. In the years 1957 through 1959, petitioner was no economic infant or adolescent; he was a successful businessman with a volume of business of more than $150,000 annually. In addition, petitioner had long experience in investing in the stock market. He had made prudent investment decisions over the years. In 1957, 1958 and 1959, he received dividends (which were unreported as income) in the amounts of $12,821.35, $11,834.00 and $12,548.25, respectively. The record shows that during each of the taxable years 1957 through 1963, petitioner understated the gross receipts and net profits from his catering business in amounts which were substantial in quantity and in proportion *107 to the amounts actually reported. (See pages 23-26.) The record also shows that while petitioner also understated his expense deductions for those years, his actual net profit exceeded his reported net profit even after allowance was made for his originally unclaimed expense deductions. While respondent relies entirely on the doctrine of collateral estoppel, based on petitioner's criminal tax evasion conviction, to sustain the fraud penalties for the years 1960 through 1963, the understatement of income in the returns for those years is evidence of a consistent pattern of understatement of income over a period of years going back to the year 1957. Fraud cannot be inferred from a mere understatement of income. Holland v. United States, 348 U.S. 121 (1954). However, it is well established that consistent understatements of income in substantial amounts over a period of years, standing alone, is sufficient evidence of a fraudulent intent to evade taxes. Holland v. United States, supra; Merritt v. Commissioner, 301 F. 2d 484 (C.A. 5, 1962); Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court, Jack M. Chesbro, 21 T.C. 123 (1953), affd. *108 225 F. 2d 674 (C.A. 2, 1955), certiorari denied 350 U.S. 995 (1956). 1246 In addition to the consistent pattern of substantial understatements of income, there are other facts of record and convincing circumstantial evidence which sustain the view that part of the deficiencies for each of the years 1957 through 1959 was due to fraud. During each of the years 1957 through 1959, petitioner failed to maintain adequate books and records of his business receipts as required by law. Section 6001 and section 1.6001-1, Income Tax Regs. As set forth in our findings, the records kept by petitioner were unsystematic and confusing during the period involved herein. Furthermore, petitioner did not utilize all the information he had available to make his returns for the years 1957 through 1959. Although his records for these years were confusing, he did have information available to him from which he could have accurately reconstructed his taxable income. The variety of information which he later made available to Nasser and Tresley for the preparation of the amended returns for the years 1957, 1958 and 1959 was available to the petitioner when he filed his original returns for those years. A taxpayer *109 must acquaint himself with information which is available to him and necessary for an accurate statement of his income. He cannot ignore it and to do so is a repudiation of his legal obligations as a taxpayer. Petitioner was required to keep adequate records of his income-producing activity and to apprise himself of information available to him in the preparation of his returns. He did not do so. Instead he chose to rely on estimates. Petitioner may very well have been quite busy with his business and often too fatigued to perform his obligations. However, in view of the fact that the estimates of his income and expenses, which petitioner furnished for the preparation of his original returns for 1957 through 1959, were made with great specificity, we do not consider these factors to be a reasonable explanation of his course of conduct. We are convinced that he was more than grossly negligent in the maintenance of his record-keeping system and in the supplying of information for the preparation of his returns for the years 1957 through 1959. In the circumstances of this case, we regard the inadequacy of his records and his failure to acquaint himself with the information available to *110 him as indicators of his fraudulent intent. Upon the foregoing considerations, and the record as a whole, we hold that respondent has proved by clear and convincing evidence that a part of the deficiency in each of the taxable years 1957 through 1959 was due to fraud and that the additions to the tax based on section 6653(b) for such years were correct. Since we have determined that a part of the deficiency in each of the years 1957 through 1959 was due to fraud, and such a finding supports the imposition of the 50 percent fraud penalty as to the entire deficiency, we do not have to consider whether petitioner's omission of divided income for each of the years 1957 through 1959 was due to fraud with intent to evade taxes. It is unnecessary for us to consider petitioner's claim for a refund of the overassessments of tax for the years 1958 and 1959, resulting from carrying forward to those years a capital loss incurred in 1957. Respondent has given petitioner full credit for the overassessments in his recomputation of taxes and penalties for the years in question. Issue 2. Deficiency Asserted for 1957 The issue involved is whether the statute of limitations established by section 6501(a) *111 [7] bars the assessment of collection of the deficiency asserted for the taxable year 1957. We have concluded that the return for 1957 was false or fraudulent with intent to evade tax. Consequently, the statute of limitations is not a bar to the assessment and collection of the deficiency asserted with respect to such year. Section 6501(c). [8] 1247 Since petitioner has not offered any evidence to overcome the deficiency determination, the deficiency must be sustained. Issue 3. Collateral Estoppel Respondent relies solely on the *112 petitioner's prior plea and conviction to sustain the imposition of fraud penalties for the taxable years 1960, 1961, 1962 and 1963. It is well settled that a prior conviction for tax evasion under section 7201, after a trial on the merits, operates as a collateral estoppel on the issue of civil fraud in a fraud penalty proceeding because at least part of any underpayment for the prosecution years must be deemed to have already been judicially determined to be "due to fraud" within the meaning of section 6653(b). Moore v. United States, 360 F. 2d 353 (C.A. 4, 1965), certiorari denied 385 U.S. 1001 (1967); Tomlinson v. Lefkowitz, 334 F. 2d 262 (C.A. 5, 1964), certiorari denied 379 U.S. 962 (1965); John W. Amos, 43 T.C. 50 (1964), affd. 360 F. 2d 358 (C.A. 4, 1965); and Armstrong v. United States, 354 F. 2d 274, 173 Ct. Cl. 944 (1965). The principle of collateral estoppel is also applicable to the situation now before us where the conviction under section 7201 is based on a plea of guilty, Tsuneo Otsuki, 53 T.C. 96 (1969) and Arctic Ice Cream Co., 43 T.C. 68 (1964), because a guilty plea is an admission of all the elements of a formal criminal charge. McCarthy v. United States, 394 U.S. 459 (1969). *113 Therefore, the petitioner's plea of guilty in the criminal proceedings is determinative of the issue of civil fraud in each of the years 1960, 1961, 1962 and 1963. The stated understanding of counsel, that the government would move to dismiss charges against Mrs. Plunkett if petitioner would plead guilty to the charges against him, does not vitiate petitioner's otherwise voluntary plea of guilty where the agreement was fully performed in conformity with the petitioner's expectations. Petitioner did not misunderstand the terms or the immediate consequences of the agreement and his plea of guilty. Hence, the existence of the agreement does not affect the voluntariness of his plea. United States v. Carlino, 400 F. 2d 56 (C.A. 2, 1968); and Cortez v. United States, 337 F. 2d 699 (C.A. 9, 1964), certiorari denied 381 U.S. 953 (1965). See also United States v. Follette, 395 F. 2d 721 (C.A. 2, 1968). Petitioner has taken no appeal directly attacking the conviction or sentence in the criminal case against him. He has paid the fine imposed upon him. In these circumstances, petitioner should not be allowed to attack the voluntariness of his guilty plea in the collateral proceeding now before *114 us, and we will not engage in a considered examination of the factors underlying his plea of guilty to the criminal charge. On this basis, we hold that, under the principle established by the Otsuki and Arctic Ice Cream Co. cases, petitioner's conviction for tax evasion in the years 1960, 1961, 1962 and 1963, pursuant to a plea of guilty, collaterally estops the petitioner from denying fraud for those years. Decisions will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
*. There is a variance between this amount, stipulated by the parties, and the amont of dividends in 1957 as determined by this Court ($13,046.35).
2. Form 940, Employer's Annual Federal Unemployment Tax Return. ↩
3. Form 941, Employer's Quarterly Federal Tax Return.↩
4. The original work sheet contained the following information: ↩
Debit
Credit
Charity
$ 34.00
Rent Income
$ 900.00
Sales
150,076.52
Purchases - Food
72,074.14
Expendable Equipment
1,993.67
Wages
26,010.68
Subcontracting
7,233.01
Subcontracting Equipment Rental
562.13
Repairs
715.58
Depreciation
1,510.00
Sales Tax
960.18
Telephone
4,129.46
Water
114.30
Electric
688.40
Gas
520.00
Licenses
197.50
Heating
529.07
Linen Service
3,373.83
Supplies
553.68
Auto and Truck Expenses
2,852.51
Paper Supplies
2,723.44
Cleaning
59.31
Union Dues
103.50
Selling Expense
17.15
Real Estate Taxes
826.89
Personal Property Taxes
326.03
Refund
17.10
Sundry Expense
259.50
Office Expenses
168.50
Bank Charges
50.31
Scavenger
528.75
Subscriptions
129.00
Advertising
696.85
Insurance
1,059.59
Postage
36.00
Christmas Expense 76.23
$131,221.29
$150,976.52
Net Profit 19,755.23
$150,976.52
150,976.52
a. Excludes $900 rent income that was listed separately in the statutory notice. ↩
b. Excludes $34.00 charity that the statutory notice disallowed as a business expense.↩
5. Per statutory notice in docket No. 4762-68.↩
6. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a).↩
7. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed), or, * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.↩
8. (c) Exceptions. - (1) False return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩